### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MERCY HEALTH-ST. VINCENT MEDICAL CENTER LLC d/b/a MERCY ST. VINCENT MEDICAL CENTER**, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>**XAVIER BECERRA**, in his official capacity as Secretary of Health & Human Services,<br><br>Defendant. | Case No. 22-cv-3578 (TNM) |

### <u>MEMORANDUM OPINION</u>

Five hospitals claim the Secretary of Health and Human Services shortchanged them on Medicare reimbursements for their nursing and allied health education programs. Medicare regulations allow hospitals to recoup the "net cost" of these programs. The parties agree that "net cost" includes some overhead for "Administrative and General" or "A&G" costs—costs the hospitals incur for their executive, legal, and accounting teams. But they disagree over the amount of A&G costs the hospitals may claim.

The parties limit their disagreement to the law; all factual issues are undisputed. So they cross-moved for summary judgment. *See* Pls.' Mot. Summ. J. (Pls.' MSJ), ECF No. 16; Def.'s Cross-Mot. Summ. J. (Def.'s X-MSJ), ECF No. 19. The Court concludes that the text of the Secretary's regulation allows the hospitals to calculate A&G costs *before* "deducting the revenue that a provider receives from tuition and student fees." 42 C.F.R. § 413.85(d). Because the hospitals are entitled to judgment as a matter of law, the Court will grant the hospitals' motion and deny the Secretary's motion.

**I.**

Technical terms and feuding formulas lie ahead in this Medicare reimbursement dispute. So a bit of regulatory table setting is in order. After that, the facts come into focus.

**A.**

A long road leads to the proper calculation of A&G costs for nursing and allied health education programs. It begins in 1965, when Congress first permitted hospitals to recover the "reasonable cost" of inpatient care for Medicare beneficiaries. *See* Health Insurance for the Aged Act (Medicare), Pub. L. No. 89-97, § 1814(b), 79 Stat. 290, 296 (1965). Congress directed the Secretary to hash out the meaning of "reasonable cost" in implementing regulations. *Id.* § 1861(v)(1), 79 Stat. at 322–23. But it said these regulations must "take into account both direct *and indirect* costs of providers of services" to ensure that Medicare covered its fair share compared to private insurance plans. *Id.* (emphasis added).

The mention of indirect costs swept in some medical education programs. Heeding Congress's command, the Secretary found that "educational activities including training programs for nurses . . . contribute to the quality of patient care." *See* Principles for Reimbursable Costs, 31 Fed. Reg. 14808, 14814 (Nov. 22, 1966). So the Secretary promulgated a regulation allowing hospitals to recoup "the net cost of approved educational activities." *Id.* And the regulation defined "net cost" as "the cost of approved educational activities (including stipends of trainees, compensation of teachers, and other costs), less any reimbursements from grants, tuition, and specific donations." *Id.*

This marked "[t]he first regulation to address [Medicare's] obligation to share in the costs of nursing and allied health education." Medicare Program; Payment for Nursing and Allied Health Education (Revised Reimbursement Rule), 66 Fed. Reg. 3358, 3359 (Jan. 12, 2001).

During the 1980s, however, Congress dialed up the details and requested regulations concerning "the *type of costs* related to nursing or allied health education programs that are *allowable* by medicare [sic]." Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6205(b)(2)(C), 103 Stat. 2106, 2244.

So the Secretary followed up with a new regulation that overhauled the "rules for determining the net costs of provider-operated nursing and allied health education programs." Revised Reimbursement Rule, 66 Fed. Reg. at 3361. This time around, "the net cost of approved educational activities is determined by deducting the revenues that a provider receives from tuition and student fees from the provider's total allowable educational costs that are directly related to approved educational activities." 42 C.F.R. § 413.85(d)(2)(i).

This dense formula tees off the parties' dispute. So the Court starts by recasting its structure: "net cost" equals "the provider's total allowable educational costs that are directly related to approved educational activities," minus "the revenues that a provider receives from tuition and student fees." *Id.* Even simpler: *Net Costs = Total Costs – Tuition Revenue.* But this formula makes no mention of A&G costs.

Enter the regulation's next paragraph, which says that "total allowable educational costs are those costs incurred by the provider for trainee stipends, compensation of teachers, and other costs of the activities as determined under the Medicare cost-finding principles in § 413.24." *Id.* § 413.85(d)(2)(ii). They "do not include patient care costs, costs incurred by a related organization, or costs that constitute a redistribution of costs from an educational institution to a provider or costs that have been or are currently being provided through community support." *Id.* Setting these excluded costs aside, "total allowable educational costs" equals direct costs ("trainee stipends" and "compensation of teachers"), plus "other costs of the activities." *Id.*

Fitted into our formula:  *Net Costs = [Total Costs (Direct Costs + Other Costs)] – Tuition Revenue*.  Closer, but still no mention of A&G costs.

That is because A&G costs hide under the umbrella of "other costs."  *Id.*  But finding the hiding spot requires navigating a regulatory Rube Goldberg machine.  It starts with the notion that "other costs" get "determined under the Medicare cost-finding principles in § 413.24."  *Id.* Turning to that cross-reference reveals that "[c]ost finding is the process of recasting the data derived from the accounts ordinarily kept by a provider to ascertain costs of the various types of services furnished."  *Id.* § 413.24(b)(1).  And the cost-finding process accomplishes this goal through "the allocation of direct costs and *proration of indirect costs*."  *Id.*  (emphasis added).

Hospitals can carry out the cost-finding process using one of several methods, such as the "step-down method" or the "double-apportionment method."  *Id.* § 413.24(d)(1)–(2) (cleaned up).  The details matter little here because all methods accomplish the same thing—they divvy up indirect costs in proportion to direct costs, without double-counting the indirect costs.  *See id.*

Here is how that works.  Every hospital groups its costs into categories called "cost centers."  Some cost centers generate patient revenue, like an operating room, a labor and delivery unit, or anesthesiology.  *See* Form CMS-2252-10, Worksheet B, Part I at Lines 50, 52, 53.  But other cost centers are just groups of overhead, like "Buildings and Fixtures," "Laundry and Linen Service," and—our hideaway—"Administrative and General."  *Id.* at Lines 1, 5, 8. When a hospital fills out its annual cost report to get reimbursed under Medicare, it must allocate *some portion* of these overhead cost centers to all other cost centers.  The cost-finding process determines *what portion* gets allocated.

Consider the hypothetical costs of an emergency room.  Under the cost-finding process, a hospital can claim the ER's "direct costs," like salaries for doctors and nurses.  42 C.F.R.

4

§ 413.24(b)(1).  But it also gets to claim the ER's "indirect costs," like costs for "Buildings and Fixtures" or "Administrative and General."  *Id.*  The cost-finding process simply "finds" what portion of these overhead costs are attributable to the ER.  For example, "Buildings and Fixtures," which captures costs like rent, gets divvied up based on square footage.  *See* CMS, *The Provider Reimbursement Review Manual – Part 2* (PRM) §§ 4020, 4057.  So if the ER occupies 10,000 square feet of a 100,000 square foot hospital, the cost-finding process would assign the ER 10% of the hospital's "Buildings and Fixtures" costs.

The same goes for A&G costs, except they get apportioned using "accumulated costs" instead of square footage.  *Id.* § 4020.  Accumulated cost refers to a cost center's net direct expenses plus any indirect cost allocations that cost center may have received through cost-finding prior to A&G allocation.  *Id.*  Return to our hypothetical ER and assume the hospital's A&G cost center has $10 million in accumulated costs and all centers combined (including A&G) have $100 million in accumulated costs.  That would apportion $0.10 in A&G costs for every dollar another cost center accumulates.  So if the ER had $20 million in accumulated costs, the cost-finding process would assign the ER $2 million in A&G costs.  Critically, the apportionment of A&G costs is *directly proportional* to a cost center's accumulated cost.  42 C.F.R. § 413.24(b)(1).  So if the ER only had $10 million in accumulated costs, it could only claim $1 million in A&G costs.

One final layer:  costs can get adjusted at various stages in the cost reporting process.  Some adjustments apply against accumulated costs *before* the cost-finding process, which has the effect of proportionally lowering A&G costs.  *See* PRM § 4016; Form CMS-2252-10, Worksheet A-8.  Other adjustments happen *after* the cost-finding process, which has the effect of reducing total costs, but not A&G.  *See* PRM § 4022; Form CMS-2252-10, Worksheet B-2.

Return to our hypothetical ER.  Suppose a $10 million *adjustment* caused the ER's drop from $20 million to $10 million in accumulated costs.  Because A&G costs are directly proportional to accumulated costs, the ER could claim $1 million in A&G costs ($0.10 x $10 million) and $11 million in total costs ($10 million + $1 million).  But what happens if the adjustment gets applied *after* the cost-finding process, while the ER still has $20 million in accumulated costs?  The ER could claim $2 million in A&G costs ($0.10 x $20 million) and $12 million in total costs ($10 million + $2 million).  The takeaway:  the timing of an adjustment—like a deduction for tuition revenue—impacts A&G costs.

**B.**

These rules apply just the same for nursing and allied health education programs.  The hospitals here want to run the cost-finding process and calculate their programs' A&G costs *before* deducting tuition revenue.  *See* 42 C.F.R. § 413.85(d).  For instance, two hospitals (Mercy St. Vincent Medical Center and Brockton Hospital) deducted tuition revenue *after* the step-down method had allocated A&G costs in proportion to the programs' direct costs.  Pls.' MSJ at 19.[1] The Secretary's agents—known as Medicare Administrative Contractors, or MACs—initially ratified these post step-down adjustments for tuition offsets.  *Id.* at 19–20.

Then the Secretary began whistling a different tune.  In 2017, the Secretary issued "Transmittal 12" which banned hospitals from using "a post step-down adjustment" to offset "tuition and student fees."  J.A. 939.  Hospitals instead had to deduct tuition and fees from its accumulated cost statistic.  J.A. 939.  This had the effect of "significantly lowering

---

[1] The Court's page references correspond to the pagination generated by CM/ECF.

reimbursement" for the hospital's nursing and allied health education programs.[2]  Pls.' MSJ at 20.

Think about it with some hypothetical numbers:  $50 million in total A&G costs, $150 million in accumulated costs for all cost centers, $1 million in accumulated costs for the education program, and $400,000 in tuition revenue for that program.  Under these variables, $0.33 in A&G costs would get apportioned for every dollar another cost center accumulates ($50 million / $150 million).

Under the hospitals' formulation, the deduction for revenue would kick in after the cost-finding process.  The process would *first* allocate $330,000 in A&G costs to the education program ($0.33 x $1 million in direct costs).  *Then* the hospital would subtract $400,000 from its direct costs ($1 million) and "other costs" ($330,000 in A&G costs).  That leaves the hospital with $930,000 in reimbursable "educational costs."  42 C.F.R. § 413.85(d)(2)(ii).

But Transmittal 12 forces the tuition offset before the calculation of A&G costs.  Using the same hypothetical variables, the hospital would only get $798,000 in reimbursable costs.  That is because the Secretary's order of operation *starts* by subtracting revenue from direct costs ($1 million – $400,000), leaving $600,000 in accumulated costs to calculate A&G costs.  But since A&G costs are directly proportional to accumulated costs, the hospital may only claim $198,000 in A&G costs ($0.33 x $600,000).  This all produces a final figure of $798,000 in reimbursable costs—well short of the $930,000 allowed under the hospitals' approach.

---

[2] The Secretary asserts he "has not changed his position on the availability of pass-through reimbursement for approved programs since the regulatory provisions at issue became effective in 2000."  Def.'s X-MSJ at 30.  But the Secretary fails to grapple with Transmittal 12—indeed, his briefs do not even mention it.  *See id.* at 30–31.  So the Court is unpersuaded by his blanket assertion of consistency.  *Cf. Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181, 190–91 (D.D.C. 2017) ("[U]nopposed arguments may be treated as conceded.").

Citing Transmittal 12, MACs reopened St. Vincent and Brockton's cost reports and "significantly lower[ed]" their reimbursements for education programs. Pls.' MSJ at 20. MACs similarly rejected the other hospitals' cost reports because they included post step-down offsets for tuition. *Id.* at 21. Dissatisfied, the hospitals appealed the MACs' determinations to the Provider Reimbursement Review Board. *Id.* But the Board denied their challenges, finding "it was appropriate for [MACs] to offset tuition revenue" from accumulated costs before the assignment of A&G costs. J.A. 21. The hospitals now seek review of the Board's determination. *See* Compl. ¶ 4, ECF No. 1; 42 U.S.C. § 1395*oo*(f)(1) (permitting judicial review of Board decisions).

## II.

Typically, summary judgment is warranted when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). But this is an APA case. So the "APA's standards of review" apply in place of "Rule 56's standards." *Landmark Hosp. of Salt Lake City v. Azar*, 442 F. Supp. 3d 327, 331 (D.D.C. 2020). In this context, "summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.* (cleaned up).

The APA, in turn, requires a court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Arbitrary and capricious review is "narrow," ensuring that the agency "examin[ed] the relevant data and articulat[ed] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).  It is also "axiomatic . . . that an agency is bound by its own regulations."  *Nat'l Env't Dev. Ass'n's Clean Air Project v. E.P.A.*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (cleaned up).  Although an agency may "amend or repeal its own regulations," it may not "ignore or violate its regulations while they remain in effect."  *Id.* (cleaned up).  So if an "agency fails to comply with its own regulations," the relevant action "may be set aside as arbitrary and capricious."  *Id.* (cleaned up).

### III.

The parties agree that the hospitals may claim A&G costs as part of their reimbursable "net cost" for nursing and allied health education programs.  42 C.F.R. § 413.85(d)(2)(i).  They part ways, however, on the *extent* to which the hospitals may claim those A&G costs.  The hospitals argue A&G costs are assessed before any offset for tuition revenue.  But the Secretary argues A&G costs get calculated after offsetting direct costs with tuition revenue.  Expressed as formulas, the parties' arguments look like this:

Hospitals:  *Net Costs = [Direct Costs + Other Costs (A&G)] – Tuition Revenue*

Secretary:  *Net Costs = [Direct Costs – Tuition Revenue] + Other Costs (A&G)*

The hospitals are right, and it is not even close.

### A.

This dispute begins and ends with the text of the Secretary's regulation.  It authorizes hospitals to recoup the "net cost of nursing and allied health education activities."  42 C.F.R. § 413.85(d)(1).  And it says that "net cost . . . is determined by deducting the revenues that a provider receives from tuition and student fees from the provider's total allowable educational costs that are directly related to approved educational activities."  *Id.*

§ 413.85(d)(2)(i).  So "net cost" equals "total allowable educational costs" minus tuition revenue. *Id.*  Or again:  *Net Costs = Total Costs − Tuition Revenue.*

The regulation then defines "total allowable educational costs" as "those costs incurred by the provider for trainee stipends, compensation of teachers, *and other costs* of the activities as determined under the Medicare cost-finding principles in § 413.24."  *Id.* § 413.85(d)(2)(ii) (emphasis added).  Recall that "other costs" include A&G costs.  *See supra* Section I.A.  So A&G costs are part of a hospital's "total allowable educational costs."  And the regulation says tuition revenue gets deducted from "total allowable educational costs."  42 C.F.R. § 413.85(d)(2)(i).  It does not say that tuition revenue gets deducted from an educational program's direct costs, such as "trainee stipends" or "compensation of teachers."  *Cf. id.* § 413.85(d)(2)(i)–(ii).

The regulation here "says what it means and means what it says."  *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022).  The Secretary may deduct tuition revenue, but *only after* determining a hospital's "total allowable educational costs."  42 C.F.R. § 413.85(d)(2)(i)–(ii). That means the Secretary must calculate "total allowable educational costs" before factoring in tuition offsets.  And to do that, the Secretary must *first* permit the hospitals to allocate A&G costs based on the accumulated cost of their educational programs.  This order of operations comes straight from the regulation—one the Secretary devised, and one he must follow.  *See Nat'l Env't Dev. Ass'n's Clean Air Project*, 752 F.3d at 1009 ("[A]n agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." (cleaned up)).[3]

---

[3] The hospitals also argue the Board's decision was arbitrary and capricious because it ignored how indirect costs are allocated in other contexts.  *See* Pls.' MSJ at 37–39.  The Court does not reach this argument because it concludes the Board's decision violates the regulatory text.

**B.**

The Board endorsed a different order of operations—one that deducts tuition revenue from accumulated cost, *then* computes A&G costs.  J.A. 21.  The Secretary offers five arguments in defense of that conclusion.  The first two animate the Board's reasoning, but neither have anything to do with the controlling regulation.  The second two seek to grapple with the regulation, but they fail to persuade.  And the final argument retreats to a plea for deference.  The Court considers each in turn.

*First*, the Board faulted the hospitals for failing to request the "use [of] an alternate methodology for allocation of A&G costs."  J.A. 14.  In its view, the hospitals "could have potentially identified an appropriate allocation methodology that resulted in a more accurate allocation of A&G costs and then sought the [MACs'] approval of that alternative allocation methodology."  J.A. 15.  But the hospitals merely seek to get paid in accordance with the Secretary's own regulation.  *See* 42 C.F.R. § 413.85(d)(2).  And the default cost-finding methodology—the step-down method—can easily fulfill this regulation.  *See id.* § 413.24(d)(1).  Proving the point, two of the hospitals here used the step-down method (and post step-down offset for tuition revenue) without objection from the Secretary until Transmittal 12 came along.  *See* Pls.' MSJ at 19–21.  So the hospitals did not need to ask for an alternative cost-finding methodology.  The Secretary's default method works just fine.

In any event, the use of an alternative method would not have solved the problem.  All cost-finding methodologies allocate indirect costs *after* direct costs have been identified *and adjusted*.  *See* 42 C.F.R. § 413.24(d).  Transmittal 12 adjusts direct costs downward by deducting tuition revenue.  J.A. 939.  That has nothing to do with cost-finding.  So when cost-finding

comes along to apportion indirect costs (no matter the method), the damage has already been done.

*Second*, the Board found that "the cost report instructions are clear that the tuition and student fees are to be offset" before calculating A&G costs.  J.A. 20.  Perhaps.  But the cost report instructions do not carry the force of law.  *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 103 (2015) ("[I]nterpretive rules do not have the force and effect of law.").  Of course, the Secretary has "the power . . . to amend or repeal [his] own regulations."  *Nat'l Env't Dev. Ass'n's Clean Air Project*, 752 F.3d at 1009 (cleaned up).  But until then, the Board "is not free to ignore or violate [his] regulations while they remain in effect."  *Id.* (cleaned up); *see also* 42 C.F.R. § 405.1867 (Board "must comply with all the provisions of Title XVIII of the Act and regulations issued thereunder").  Yet that happened here—the Board erroneously clung to the cost report instructions at the expense of the controlling regulations.  J.A. 20.

*Third*, coming closer to the mark, the Secretary argues the regulation limits net cost to costs that are "allowable" and "directly related to approved educational activities."  42 C.F.R. § 413.85(d)(2)(ii).  In his view, this language justifies deducting tuition revenue from direct costs prior to calculating A&G costs.  Def.'s X-MSJ at 18.  It does not.

For starters, the Secretary's interpretation functionally reduces "total allowable educational costs that are directly related to approved educational activities" to "direct costs."  42 C.F.R. § 413.85(d)(2)(i).  But that conflicts with the definition of "total allowable educational costs" in the very next paragraph:  direct costs like stipends and compensation, *plus* "other costs" that get calculated under cost-finding principles.  *Id.* § 413.85(d)(2)(ii).  So total allowable costs that are "directly related to" educational programs *are* the direct and indirect costs spelled out in § 413.85(d)(2)(ii).

Common sense confirms this reading.  There are undoubtedly legal and accounting costs directly related to the operation of a hospital's nursing and allied health education program.  But rather than wading through every line of a hospital's legal and accounting records, the regulation devised a short cut:  the cost-finding process that divvies up A&G expenses based on accumulated costs.  At times, even the Secretary nods at the correctness of this interpretation. *See* Def.'s X-MSJ at 24 (stating "directly related" "modif[ies] the 'total' allowable costs by excluding tuition and fees from *both the direct and indirect* cost calculations" (emphasis added)). And this momentary concession echoes the preamble to the reimbursement rule.  There, the Secretary said that "'total costs' include only direct *and indirect* costs incurred by a provider that are *directly* attributable to the operation of an approved educational activity."  Revised Reimbursement Rule, 66 Fed. Reg. at 3367 (emphasis added).

The Secretary's argument also proves too little.  A&G costs *still* get factored into "net costs" under the Secretary's formulation, just after direct costs get discounted for tuition.  But the front-end tuition discount cannot possibly guarantee that all remaining A&G costs are "directly related" to the educational programs.  42 C.F.R. § 413.85(d)(2)(i).  Suppose a program had $1 million in direct costs and was slated to receive a $330,000 A&G allocation.  What difference does it make if the program received $250,000, $500,000, or $1,000,000 in tuition?  None, because tuition revenue does not affect the A&G costs incurred by a program.

Then there is the Secretary's double-counting problem.  If the Secretary is right that "total allowable educational costs" are calculated by deducting tuition at the outset, then tuition must be deducted twice:  first in calculating "total allowable costs," and then again in calculating "net cost" after the allocation of indirect costs.  *Id.* § 413.85(d)(2)(i).  Indeed, this is the only way to make sense of the Secretary's representation that tuition and fees must be excluded "from both

13

the direct *and indirect* cost calculations."  Def.'s X-MSJ at 19 (emphasis added).  But there is a better reading to the regulation:  apply the deduction once against the sum of direct and "other costs" when calculating "net cost."  42 C.F.R. § 413.85(d)(2)(i)–(ii).

*Fourth*, the Secretary argues that "total allowable educational costs" excludes "costs that have been or are currently being provided through community support." *Id.* § 413.85(d)(2)(ii). And the regulation defines community support as "funding that is provided by the community and generally includes all non-Medicare sources of funding." *Id.* § 413.85(c).  All true.

But the community support clause does not control the treatment of tuition revenue. Assuming tuition revenue qualifies as "community support" (an issue the Court does not decide), the Secretary *specifically* instructed hospitals to deduct "tuition and student fee[]" revenue from "total allowable educational costs." *Id.* § 413.85(d)(2)(i).  Interpreting the community support clause to authorize some *other* treatment of "tuition and student fees" would directly contravene the Secretary's specific instructions on that precise issue. *See Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698 (D.C. Cir. 2014) (describing "the basic principle of statutory construction that a specific statute controls over a general provision particularly when the two are interrelated and closely positioned" (cleaned up)).  So the community support clause does not control here.

Even if it did control, and assuming tuition revenue constitutes "community support," the outcome would be the same.  The first paragraph of the net cost provision says that "total allowable educational costs" get offset by "the revenues that a provider receives from tuition and student fees." 42 C.F.R. § 413.85(d)(2)(i).  The second paragraph says that "total allowable educational costs" exclude "costs that have been or are currently being provided by community support." *Id.* § 413.85(d)(2)(ii).  Both paragraphs carve income (either tuition revenue or community support funding) from "*total* allowable educational costs." *Id.* at 413.85(d)(2)(i)–(ii)

(emphasis added).  Neither paragraph carves the income solely from *accumulated costs*—the only way it would affect A&G costs.  *See supra* Section I.A.

*Fifth*, the Secretary asks for deference under *Auer v. Robbins*, 519 U.S. 452 (1997) and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945).  *See* Def.'s X-MSJ at 27.  But "a court should not afford *Auer* deference unless the regulation is genuinely ambiguous."  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).  And a genuine ambiguity exists only when no "right answer" appears after "exhaust[ing] all the 'traditional tools' of construction," such as "text, structure, history, and purpose."  *Id.* (cleaned up).

Here, the first tool in the "legal toolkit" provided the answer:  text.  No "uncertainty" lurks in the language of the Secretary's regulation.  *Id.*  It "just means what it means," so "the [C]ourt must give it effect" without affording deference.  *Id.*

## C.

A final word on the proper remedy.  The Secretary asks for a light touch in the event of an adverse ruling.  *See* Def.'s X-MSJ at 34–35.  He urges the Court to simply vacate the Board's decision and remand for "additional investigation or explanation."  *Id.* at 34 (quoting *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999)).  He is half right.  The proper remedy is remand.  *See Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency[.]").  But on remand, the agency must take "further action consistent with the corrected legal standards" identified in this opinion.  *Shalala*, 192 F.3d at 1011 (cleaned up).

**IV.**

As this Court noted before, "[E]ach of us has his cross to bear." *PAM Squared at Texarkana, LLC v. Azar*, 436 F. Supp. 3d 52, 61 (D.D.C. 2020) (quoting Franz Kafka, *The Trial* 134 (Breon Mitchell trans., 1998)).  For the Secretary and the Board, "theirs is that if they create a Kafkaesque regulatory labyrinth for hospitals, they must be able to navigate it themselves." *Id.* To be sure, the Secretary could likely require his preferred order of operations.  But he must first amend the relevant regulation.

Because the Board incorrectly calculated the hospitals' reimbursements for nursing and allied health education programs, the hospitals are entitled to summary judgment.  The Court will therefore grant the hospitals' motion, deny the Secretary's motion, and remand this matter to the agency for further proceedings consistent with this opinion.  A corresponding Order will issue today.


Dated:  February 9, 2024                                  _____
                                                                          TREVOR N. McFADDEN, U.S.D.J.

16